## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| BRENT JOHNSON, individually and on behalf of all others similarly situated, | Case No. |
| Plaintiff, | <u>JURY TRIAL DEMANDED</u> |
| v. | |
| FORD MOTOR COMPANY, | |
| Defendant. | |

## <u>CLASS ACTION COMPLAINT</u>

## I.      NATURE OF THE ACTION

1.      Plaintiff Brent Johnson brings this class action against Ford Motor Company ("Ford" or "Defendant") for declaratory judgment and/or injunctive relief, as well as money damages against Ford, for unfair, unlawful, and fraudulent business practices; breach of express and implied warranties; and related claims. Plaintiff brings this action on behalf of himself and all persons or entities residing in the United States who purchased or leased a 2020–2023 Ford Explorer equipped with a Rear View 360-Degree Camera (the "Class Vehicles").

2.      As of 2018, federal law made backup cameras a required safety feature on all new vehicles sold in the United States.

3.      The Rear View 360-Degree Camera (the "360-Degree Camera") on the Class Vehicles serves as the vehicles' backup camera. It is also marketed as providing added value to

Class Vehicle purchasers because the 360-Degree Camera provides not just an image of the area directly behind the vehicle while in reverse, but also a top-down view of the entire vehicle.

4.     A functioning 360-Degree Camera provides an image like that below:[1]



5.     However, as documented in a long series of National Highway Traffic Safety complaints, four manufacturer recalls, and even a manufacturer stop-sale order, the 360-Degree Camera in the Class Vehicles intermittently fails, displaying a completely or partially blank screen in place of the display ("the Defect").

6.     When the 360-Degree Camera fails, the vehicle does not display the federally-mandated image of the area directly behind the vehicle while reversing. Instead, the driver sees a blue or back screen.

7.     The Defect causes a serious safety issue: drivers of the Class Vehicles—large, high riding SUVs—cannot see what is behind them when in reverse.

8.     Ford has reported to NHTSA that the Defect has caused at least 17 accidents.[2]

---

[1]https://shop.ford.com/configure/explorer/config/exterior/Config%5B%7CFord%7CExplorer%7C2023%7C1%7C1.%7C200A.K7D..PM7...99H.XLT.%5D?intcmp=vhp-bb-fbc-explorer (last visited September 1, 2023).

[2] https://static.nhtsa.gov/odi/rcl/2023/RCLRPT-23V022-4349.PDF (last accessed September 5, 2023).

## II.    PARTIES

**A.    Plaintiff**

9.      In February 2021, Plaintiff Brent Johnson, a resident of Vancouver, Washington, purchased a new 2020 Ford Explorer Platinum equipped with a 360-Degree Camera from a Ford dealership in Woodburn, Oregon.

10.     Plaintiff's 360-Degree Camera failed in November 2021. A Ford dealership applied the then-current software update from Recall 21S44 (discussed below). That software update did not fix the Defect in Plaintiff's Explorer.

11.     Plaintiff took his Explorer to a Ford dealership a second time in 2023 and asked it to repair the Defect in his Explorer. The Ford dealership applied another software update. That software update did not fix the Defect in Plaintiff's Explorer. Plaintiff has now visited two separate dealerships—one in Woodburn, Oregon and one in Vancouver, Washington—that have applied software updates to his vehicle in an attempt to fix the Defect; neither was successful.

12.     Plaintiff's 360-Degree Camera has failed roughly half of the times he has put his Explorer in reverse for the entirety of his ownership. His 360-Degree Camera failed most recently today, the day this Complaint was filed, when his 360-Degree Camera provided only a blue screen when he put his vehicle in reverse.

13.     Prior to purchasing his 2020 Explorer, Mr. Johnson spoke with a sales representative at the Ford dealership, saw commercials for the 2020 Explorer, and saw a Monroney sticker on the vehicle at the time of purchase. Ford did not disclose the Defect through any of these avenues.

14.     Ford failed to disclose the Defect to Mr. Johnson before he purchased his Explorer, despite Ford's knowledge of the Defect.

15.     Had Ford disclosed the Defect to Mr. Johnson, Mr. Johnson would not have purchased his 2020 Explorer or would have paid substantially less for the vehicle. Plaintiff's experience mirrors that of thousands of other owners and lessees of Class Vehicles with the Defect.

**B.     Defendant**

16.     Defendant Ford Motor Company is a corporation organized under the laws of the State of Delaware and headquartered in Dearborn, Michigan.

17.     Ford is responsible for the manufacturing, sales, marketing, service, distribution, import, and export of the Class Vehicles. Ford is also the warrantor and distributor of Ford vehicles, including the Class Vehicles, throughout the United States.

18.     To sell vehicles to the general public, Ford enters into agreements with authorized dealerships who engage in retail sales with consumers such as Plaintiff. In return for the exclusive right to sell new Ford-branded vehicles, authorized dealerships are also permitted to service and repair these new vehicles under the warranties Ford provides directly to consumers. All service and repair at an authorized dealership is completed according to Ford instructions, issued through service manuals, Technical Service Bulletins ("TSBs"), and other documents. Per the agreements between Ford and the authorized dealers, consumers like Plaintiff can receive services under Ford's warranty at dealer locations that are convenient to them. These agreements provide Ford with a significant amount of control over the actions of the authorized dealerships. For example, Ford employees are appointed as managers for particular regions of the United States, and their responsibilities include managing the day-to-day operations of the dealerships located within their regions.

19.     Ford developed and disseminated the owner's manual and warranty booklets,

advertisements, and other promotional material relating to the Class Vehicles. Ford is also responsible for the production and content of the information on the Monroney Stickers.

20.     Ford is the drafter of the warranties it provides to consumers nationwide, the terms of which unreasonably favor Defendant. Consumers are not given a meaningful choice in the terms of the warranties provided by Defendant, and those warranties are offered on a "take it or leave it" basis.

## III.     JURISDICTION AND VENUE

21.     This Court has subject matter jurisdiction under the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §§ 1332(d), because the putative class numbers more than 100, the aggregate amount in controversy exceeds $5,000,000 excluding costs and interest, and Plaintiff Johnson is a citizen of a different state than Defendant.

22.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District. Ford manufactured Class Vehicles in this District, including the Class Vehicle purchased by Plaintiff Johnson. Ford has otherwise conducted extensive business in this District, including sales of Class Vehicles, causing harm to additional Class Members residing in this District.

## IV.     FACTUAL ALLEGATIONS

23.     Defendant designed, manufactured, distributed, warranted, and marketed the Class Vehicles. According to publicly available information, consumers purchased several hundred thousand Class Vehicles.

24.     Defendant provided all purchasers or lessees of the Class Vehicles with Ford's New Vehicle Limited Warranty (the "NVLW"). The terms of this warranty are non-negotiable, and Defendant exercises sole authority in determining whether and to what extent a particular

repair is covered under the warranties it offers.

25.     The NVLW provided by Ford includes basic bumper-to-bumper warranty

coverage, and states, in relevant part:

> Your NEW VEHICLE LIMITED WARRANTY gives you specific legal
> rights. You may have other rights that vary from state to state. Under your
> New Vehicle Limited Warranty if:
>
> - your Ford vehicle is properly operated and maintained, and
>
> - was taken to a Ford dealership for a warranted repair during the warranty
> period,
>
> then authorized Ford Motor Company dealers will, without charge, repair,
> replace, or adjust all parts on your vehicle that malfunction or fail during
> normal use during the applicable coverage period due to a manufacturing
> defect in factory-supplied materials or factory workmanship.

26.     Beginning May 1, 2018, federal law mandates that every new vehicle sold in the

United States has a rear visibility system that displays a visual image "of the area directly behind

a vehicle that is provided in a single location to the vehicle operator and by means of indirect

vision." 49 CFR § 571.111 S4.

27.     The purpose of 49 CFR § 571.111 is "to reduce the number of deaths and injuries

that occur when the driver of a motor vehicle does not have a clear and reasonably unobstructed

view to the rear."

28.     Federal regulation requires that the rear image "shall remain visible during the

backing event until either, the driver modifies the view, or the vehicle direction selector is

removed from the reverse position." 49 CFR § 571.111 S5.5.5.

29.     The Class Vehicles do not comply with this mandate because the Defect leaves

the driver with no rear image.

30.     In July 2021, following widespread customer complaints and warranty claims reporting intermittent and unpredictable failures of the 360-Degree Camera, Ford released a software update intended to remedy the Defect on 2020–2021 Ford Explorers and two non-Class Vehicles also manufactured by Ford: Lincoln Aviators and Corsairs. The software update failed to fix the Defect.

31.     On September 23, 2021, Ford issued recall 21S44,[3] a second software update to attempt to remedy the Defect for 2020–2021 Ford Explorers, Lincoln Aviators, and Lincoln Corsairs, totaling 228,297 vehicles. At that time Ford estimated the percentage of those vehicles with the Defect was 44%.

32.     In Recall 21S44, Ford stated:

In some of the affected vehicles, an issue within the 360° cameras may cause the video information from one or more of the 360° cameras, including the rear-view camera, to fail to feed to the SYNC display screen during some key cycles when the vehicle is shifted into reverse. If this occurs, the SYNC screen will display a blue screen. The issue is intermittent and may recover during subsequent ignition cycles. The loss of the rear camera image during a reverse action increases the risk of crash.

33.     The software update in Recall 21S44 failed to correct the Defect.

34.     On January 23, 2023, Ford issued a second recall, number 23S02,[4] with a third software update to attempt to fix the Defect in 2020–2023 Ford Explorers and Lincoln Aviators, as well as 2020–2022 Lincoln Corsairs. Ford acknowledged that 382,759 vehicles were impacted and estimated that 100% of the vehicles covered by the recall had the Defect.

35.     In its 23S02 recall notice, Ford reported 17 "minor crashes" related to the Defect.

36.     The software update in Recall 23S02 failed to correct the Defect.

---

[3] https://static.nhtsa.gov/odi/rcl/2021/RCMN-21V735-9800.pdf  (last accessed September 13, 2023)
[4] https://static.nhtsa.gov/odi/rcl/2023/RCLRPT-23V022-4349.PDF (last accessed September 5, 2023)

37.     On April 5, 2023, Ford issued a stop sale for certain build dates of Class Vehicles.[5]  The stop sale is still in place. Ford dealers cannot sell, deliver, or even test drive the covered Class Vehicles in their inventory.

38.     On May 16, 2023, Ford issued a third recall, number 23S23,[6] with a fourth software update to address the Defect. Recall 23S23 further expanded the number of vehicles to 422,201, including Class Vehicles. The recall notice explicitly states this software update is not a permanent fix.

39.     Recall Notice 23S23 states "[t]he root cause for the loss of video frames is still unknown and under investigation" and "[t]he remedy is under development."

40.     On August 25, 2023, Ford issued a Part 573 Safety Recall Report[7] to update Recall 23S23. It details multiple root causes of the Defect:

> Depending on the camera vehicle system, 3 causal factors can affect rate of defect: camera hardware, wiring retention, and IPMB software. Within the camera, fretting corrosion causes tin oxide formation on the internal camera connector due to thermally induced micro-movement between the tin-plated contact surfaces. The rate of tin oxide accumulation in the connector is dependent on environmental factors like temperature and humidity. Additionally, internal connector misalignment may occur during manufacturing process and lead to permanent contact deformation. Both of these hardware root causes may result in degraded circuit continuity at the rearview camera's internal coaxial connector resulting in a loss of video frames. Rearview camera circuit integrity may be influenced by the specific vehicle wiring retention strategy. When a loss of video frames in the Valeo Image Processing Module – B (IPMB) occurs during the reinitialization process or when the cameras enter sleep mode during re-initialization process, the IPMB software version IT 18.1 is susceptible to displaying a blue image or a full blue or black screen when the vehicle begins a backing event.

---

[5] https://static.nhtsa.gov/odi/rcl/2023/RCMN-23V022-9738.pdf  (last accessed September 5, 2023).
[6] https://static.nhtsa.gov/odi/rcl/2023/RCLRPT-23V342-5988.PDF (last accessed September 5, 2023).
[7] https://static.nhtsa.gov/odi/rcl/2023/RCLRPT-23V342-3353.PDF (last accessed September 5, 2023).

41.     The August 25 Recall 23S23 update also states that it does not currently have the parts available that Ford claims will address the Defect. It provides no timeline for when those parts will become available, or how long it will take to repair approximately 300,000 Class Vehicles and over 400,000 total vehicles.

42.     On August 25, 2023, Ford issued a fourth recall, number 23S48, involving the 360-Degree Camera in five Ford models: Lincoln Navigators, Lincoln Aviators, Lincoln Corsairs, Ford Transits, and Ford Broncos. The recall does not apply to Class Vehicles, the Ford Explorers. Recall 23S48 details a parts replacement to attempt to fix the Defect, just not in Class Vehicles.

43.     Ford has chosen to fix the Defect in certain of its models, but not Class Vehicles.

**Ford is on Notice of the Defect**

44.     Ford knew about the existence of the Defect when it sold Plaintiff his vehicle in February 2021. Such knowledge can be imputed both from Ford's field-testing procedures and its presumed compliance with the TREAD Act, an expansive federal law that requires, among other things, vehicle manufacturers to track vehicles' diagnoses and repairs for alleged defects in a single, aggregated database. 49 U.S.C. § 30166(m)(3)(A)(West).

45.     Like all major vehicle manufacturers, Ford performs comprehensive field testing on its vehicles before the company releases them on the consumer market. Considering that this Defect manifests early in the lifespan of the affected vehicles—in Plaintiff's case, the Defect manifested for the first time within the first year of his purchase—standard, pre-release field testing would have alerted Ford engineers to the existence of the Defect. However, Ford failed to act on this knowledge. Instead of delaying the release of the Class Vehicles until its engineers could get to the bottom of the Defect, Ford instead proceeded full steam ahead with the rollout,

releasing vehicles into the stream of commerce that it knew contained camera systems suffering

from the Defect. Ford subsequently marketed and sold these vehicles to unsuspecting consumers

without disclosing the safety risk or warning to Class members. In making this series of

decisions, Ford placed its own interests ahead of those of consumers.

46.     Ford was also put on notice about the Defect's existence from a cascade of

information pouring into its dealerships from frustrated customers, who were taking their cars in

for repair and complaining to Ford mechanics that their cameras were not functioning properly.

Pursuant to its obligations under the TREAD Act, Ford had to meticulously document and

aggregate these types of consumer-driven field reports and the accompanying warranty data they

produced. Indeed, Ford, like any major vehicle manufacturer, likely has compliance officers

whose entire job is to make sure the company complies with its "early warning" reporting

obligations under the TREAD Act.[8]

47.     In addition to the warranty data produced by customers bringing their vehicles

into dealership for repairs, Ford was also put on notice about the Defect through NHTSA

complaints. Complaints about the 2020 Ford Explorer's cameras were being filed with NHTSA

well before Plaintiff purchased his vehicle. The following complaints, for example, were all filed

by owners of the 2020 Ford Explorer in the months preceding Plaintiff's purchase:

July 15, 2020:

> SEVERAL TIMES THE REVERSE CAMERA AND SENSOR HAVE NOT WORKED
> (BLUE SCREEN) ONE OF THE TIMES ALMOST HITTING A CAR BEHIND ME,
> ONCE THE CENTER SCREEN WENT BLACK WHILE DRIVING WHILE USING

---

[8] Of the major American car manufacturers, Ford is perhaps uniquely aware of the duties imposed upon it by the TREAD Act. Ford was responsible for the passage of the TREAD Act. Congress passed the sweeping law in 2000 largely in response to anger at Ford's failure to notify NHTSA of numerous tire-related safety campaigns conducted in overseas markets related to the Ford Explorer. *See* Kevin M. McDonald, *Don't Tread on Me: Faster Than A Tire Blowout, Congress Passes Wide-Sweeping Legislation That Treads on the Thirty-Five Year Old Motor Vehicle Safety Act*, 49 Buff. L. Rev. 1163, 1163 (2001).

THE NAVIGATION SYSTEM, THIS MORNING, PUT THE TRANSMISSION IN
REVERSE AND THE BRAKE PEDAL BECAME REALLY HARD WHEN
STEPPING ON IT AND AGAIN ALMOST HIT A CAR BEHIND ME, SUDDENLY IT
WENT TO THE FLOOR CAUSING THE CAR TO STOP SUDDENLY ALL THIS
WHILE GETTING OUT OF A PARKING SPACE[9]

October 1, 2020:

BACK UP CAMERA MALFUNCTIONING. MY CAR WAS BUILT NOV 1, 2019
NOT COVERED BY CURRENT RECALL BUT HAVING SAME ISSUES[10]

October 15, 2020:

… BACK UP CAMERA IS STILL NOT WORKING AND CAN NOT SEE BEHIND
YOU OR WHEN YOU ARE GOING TO HIT SOMETHING.[11]

October 18, 2020:

WHEN PUTTING VEHICLRE [*sic*] INTO REVERSE, THE
BACKUP CAMERA WORKS ONLY INTERMITTENTLY. WARNING COMES UP
TO SEE OWNERS MANUAL WHICH PROVIDES NO INFORMATION TO
RESOLVE THIS PROBLEM.[12]

November 17, 2020:

SEVERAL TIMES WHEN THE REAR CAMERA JUST DOESN'T WORK - NO
PARTICULAR REASON BUT IT'S JUST OUT. IT USUALLY RESUMES NORMAL
OPERATION AFTER SHUTTING OFF THE CAR AND RESTARTING BUT
SOMETIMES I'VE HAD TO SHUTDOWN AND RESTART MORE THAN ONCE
(SEE PICTURE FROM MOST RECENT ISSUE). THE EMERGENCY BREAKING
SYSTEM, PARTICULARLY WHEN MOVING IN REVERSE HAS ENGAGED
UNEXPECTEDLY NUMEROUS TIMES WITHOUT WARNING AND WITHOUT
ANY DANGER OR OBSTRUCTIONS IN THE WAY OF MY CAR. THIS HAS
HAPPENED IN MY DRIVEWAY WELL BEFORE THE SIDEWALK AND WHEN
THERE HAVE BEEN NO PEOPLE ARE ANIMALS ANYWHERE NEARBY. THIS
HAS ALSO HAPPENED AT OTHER TIMES AND PLACES BEYOND MY
DRIVEWAY AND I'VE HAD THE EMERGENCY BREAKING SYSTEM ENGAGED
WHILE IN DRIVE AND STOPPED AT A STOP LIGHT. THERE HAVE BEEN
OTHER UNUSUAL ELECTRICAL ISSUES WHERE THAT AREN'T NECESSARILY
SAFETY RELATED BUT MIGHT INDICATE A BROADER ELECTRICAL ISSUE.

---

[9] NHTSA ID No. 11339573.
[10] NHTSA ID No. 11362161.
[11] NHTSA ID No. 11364533
[12] NHTSA ID No. 11364873

FOR EXAMPLE, THE RADIO OFTEN DOESN'T WORK OR RESPOND TO COMMANDS TO CHANGE CHANNELS, VOLUME, ETC.[13]

November 22, 2020:

WHEN REVERSING CAMERA WILL SHOW BLUE SCREEN AND NOT GIVE ANY ADDITIONAL WARNINGS SINCE NOTHING CAN BE DETECTED. THIS IS AND ON AND OFF ISSUE SO CAN HAPPEN AT ANY TIME. I'VE ADDED PICTURES TAKEN AT DIFFERENT DAYS AND TIMES. I'VE JUST PUT TODAY'S DATE BECAUSE I CAN'T REMEMBER HOW LONG AS THIS HAS BEEN HAPPENING FOR.[14]

November 29, 2020:

BACK UP CAMERA INOPERATIVE. IN REVERSE, THE VEHCLE WILL SWITCH TO THE BACKUP CAMERA BUT THE DRIVER CAN NOT SEE THE IMAGES, THE SCREEN WOULD BE DARK AND SNOWY.[15]

January 3, 2021:

REARVIEW CAMERA RANDOMLY STOPS WORKING WITH THE SCREEN BECOMING BLUE. RANDOMLY HAPPENS WHEN PUTTING IN REVERSE. HAPPENS 80% OF THE TIME[16]

48.    For every complaint that a consumer files with NHTSA, a car manufacturer likely receives hundreds, or even thousands, of related warranty claims.[17]

49.    Through monitoring warranty data and NHTSA activity—which is required to be in full compliance with the TREAD Act—Ford knew, or should have known, of the Defect soon after the rollout of the 2020 Ford Explorer, well before it sold a defective vehicle to Plaintiff.

**The Defect Poses an Unreasonable Safety Hazard**

---

[13] NHTSA ID No. 11375093
[14] NHTSA ID No. 11375806
[15] NHTSA ID No. 11377013
[16] NHTSA ID No. 11386307
[17] For comparison, in a different case—this one involving Honda—Honda, as is mandated by federal regulations, prepared a section 573.6(b)(6) report for NHTSA detailing the history of its investigation into a potential defect. *See* https://static.nhtsa.gov/odi/rcl/2017/RMISC-17V418-5009.pdf. In that report, Honda noted that a potential defect involving a "thermal event" was suspected in some 3,826 warranty claims, even though "zero field reports" were reported.

50.     Federal regulation has required a reverse camera for more than five years for a simple reason: it makes cars safer.

51.     Particularly in a tall SUV like the Class Vehicles, a reverse camera reduces the chances that the driver will collide with a stationary object, another car, or a person.

52.     Class Vehicles' 360-Degree Cameras have never been compliant with federal regulations because they do not function reliably and in some cases do not function at all.

**Defendant Has Unjustly Retained a Substantial Benefit**

53.     Discovery will show that Defendant unlawfully failed to disclose the Defect to induce Plaintiff and other Class Members to purchase or lease the Class Vehicles.

54.     Defendant engaged in deceptive acts or practices in Plaintiff's and Class Members' purchases or leases of Class Vehicles.

55.     Plaintiff and the Class paid more money for the 360-Degree Camera than they would have for the standard reverse camera that is also available on Class Vehicles.

56.     Defendant unlawfully induced Plaintiff and Class Members to purchase or lease their Class Vehicles by concealing a material fact (the Defect), and Plaintiff and Class Members would have paid less for the Class Vehicle, or not purchased it at all, had they known of the Defect.

**The Vehicle Warranties Instruct Plaintiff to Seek Repairs at Authorized Dealerships**

57.     To sell vehicles to the general public, Ford enters into agreements with its networks of authorized dealerships to engage in retail sales with consumers such as Plaintiff, while also advertising the warranties it provides directly to consumers when they purchase a Ford-branded vehicle from the authorized dealership. These agreements specifically authorize the dealerships to act in Ford's stead to provide repairs under Ford warranties. Accordingly,

13

discovery will show, particularly through the dealership agreements between Defendant Ford and third-party dealerships, that Defendant Ford has authorized these dealerships to be its agents for the purposes of warranty repairs to provide warranty repairs on its behalf, including diagnosis of whether warranty repairs are required. As such, the consumers are third-party beneficiaries of these dealership agreements because they benefit from being able to purchase vehicles and receive warranty repairs locally. Discovery will show that because Plaintiff and Class Members are third-party beneficiaries of the dealership agreement—which creates an implied warranty of merchantability of the goods being sold by these authorized dealerships—they may avail themselves of the implied warranty against Defendant.

58.     Plaintiff and each of the Class Members are the intended beneficiaries of the express and implied warranties that accompany each Class Vehicle. The dealers were not intended to be the ultimate consumers of the Class Vehicles, and they have no rights under the warranty agreements provided by Ford. These warranties were designed for and intended to benefit the consumers only. The consumers are the true intended beneficiaries of the express and implied warranties, and the consumers may therefore avail themselves of those warranties.

59.     Ford issued the express warranty to Plaintiff and the Class Members. Ford also developed and disseminated the owner's manuals and warranty booklets that direct consumers to take their vehicles to authorized dealerships for diagnosis and repair. Ford also developed and disseminated the advertisements, such as vehicle brochures and television commercials, and other promotional materials relating to the Class Vehicles, which promoted the terms of the warranties that they issue with the sale of each Class Vehicle. Ford is also responsible for the content of the Monroney Stickers on its vehicles. Because Ford issues the express warranties

14

directly to consumers, Plaintiff and Class Members are in direct privity with Ford with respect to the warranties.

60.     In promoting, selling, and repairing their defective vehicles, Defendant authorizes dealerships to provide repairs that are the responsibility of Ford to provide under Ford's warranties. Ford fulfills its responsibilities under the warranties by, among other things, requiring the following:

(a)     The authorized dealerships complete all service and repair according to instructions disseminated directly to them by Ford, including service manuals, TSBs, SSMs, and other documents drafted by Ford;

(b)     Technicians at the dealerships are required to attend Ford trainings yearly in order to remain certified to work on Ford vehicles, at which they receive training on proprietary systems and are provided step-by-step instructions on diagnosing and repairing Ford vehicles;

(c)     Consumers are able to receive services under Ford's NVLW only at authorized dealerships, and they are able to receive these services because of the agreements between Ford and the authorized dealers;

(d)     The warranties provided by Ford for the defective vehicles direct consumers to take their vehicles to authorized dealerships for repairs or services;

(e)     Ford manages the way dealers can respond to complaints and inquiries concerning defective vehicles, and the dealerships are able to perform repairs under warranty only with Ford's authorization;

(f)     Ford has entered into agreements and understandings with their authorized dealers pursuant to which they manage the dealers' interaction with the public, including the advertising of the Class Vehicles, the terms and conditions of the express warranties, and the terms under which consumers may avail themselves of the remedies under those express warranties; and

(g)     Ford implemented its express and implied warranties as they relate to the Defect alleged herein by instructing authorized Ford dealerships to address complaints of the Defect by prescribing and implementing the relevant TSBs and the Recall cited herein.

(h)     Indeed, the Ford warranty booklet makes it abundantly clear that only its authorized dealerships can provide warranty service. The booklets, which are plainly written for the consumers, not the dealerships, tell consumers that to obtain warranty service, their Ford vehicle must be "taken to a Ford dealership for a warranted repair during the warranty period." (Ford Warranty).

**Plaintiff and Class Members Paid For, But Did Not Receive, a Functioning 360-Degree Camera.**

61.    Whether as part of the vehicle price or as an option, Plaintiff and Class Members paid more for the 360-Degree Camera than they would for the standard reverse camera also available on Ford Explorers.

62.    Even if Ford were willing and able to remedy the Defect in Plaintiff and Class Members' Class Vehicles tomorrow, Plaintiff and Class Members paid for—but did not have the

benefit of—a functioning 360-Degree Camera for a significant portion of their Class Vehicles' useful lives. They did not get what they paid for.

## V.   TOLLING OF THE STATUTE OF LIMITATIONS

**Fraudulent Concealment Tolling**

63.   Ford has known of the Defect in the Class Vehicles since at least 2020, and certainly well before Plaintiff and Class Members purchased their Class Vehicles, and yet concealed from or failed to disclose to Plaintiff, Class Members, and the public of the full and complete nature of the Defect. For instance, the four recalls issued by Ford from 2021–2023 each purported to fix the Defect and each was insufficient. Upon information and belief, Ford knew that the recalls would not be effective prior to issuing them, but still represented the recall repairs as being fixes for the Defect in hundreds of thousands of vehicles, including the Class Vehicles.

64.   Any applicable statute of limitation has been tolled by Ford's knowledge, active concealment, and denial of the facts alleged herein, which behavior is ongoing.

**Estoppel**

65.   Ford was and is under a continuous duty to disclose to Plaintiff and Class Members the true character, quality, and nature of the Class Vehicles. Ford actively concealed—and continues to conceal—the true character, quality, and nature of the Class Vehicles, and it knowingly made misrepresentations about the safety and features of the Class Vehicles. Plaintiffs and Class Members reasonably relied upon Ford's knowing misrepresentations and active concealment of these facts. Based on the foregoing, Ford is estopped from relying on any statutes of limitation in defense of this action.

**Discovery Rule**

66.     The causes of action alleged herein did not accrue until Plaintiff and Class Members discovered that their Class Vehicles contained the Defect.

67.     However, Plaintiff and Class Members had no realistic ability to discern that the Class Vehicles were defective. Thus Plaintiff and Class Members were not reasonably able to discover the Defect until after they had purchased their Class Vehicles, despite their exercise of due diligence. Therefore, their causes of action did not accrue until they discovered that the Defect caused their 360-Degree Camera to malfunction some or all of the time, and that Ford had not repaired or could not adequately repair the issue despite issuing numerous recalls purporting to do so.

## VI.     CLASS ALLEGATIONS

68.     Plaintiff brings this lawsuit as a class action on behalf of himself and all others similarly situated as members of the proposed Class pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3). This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

69.     The Class is defined as:

**Nationwide Class**:  All persons and entities in the United States who purchased or leased a Class Vehicle (the "Nationwide Class" or "Class").

In the alternative, Plaintiff bring claims on behalf of:

**Oregon Class**:  All persons and entities who purchased or leased a Class Vehicle in the State of Oregon (the "Oregon Class").

**Washington Consumer Protection Act Class:** All persons and entities who are residents of Washington and purchased or leased a Class Vehicle (the "Washington Consumer Protection Act Class").

70.     Excluded from the proposed classes are: (1) Defendant, any entity or division in which Defendant has a controlling interest, and its legal representatives, officers, directors, assigns, and successors; (2) the Judge to whom this case is assigned, his or her immediate family members, and the Judge's staff; and (3) any Judge who may hear an appeal of any judgment entered. Plaintiff reserves the right to amend the Class definitions if discovery and further investigation reveal that the Class should be expanded or otherwise modified.

71.     <u>Numerosity</u>:  Although the exact number of Class Members is uncertain, and can be ascertained only through appropriate discovery, the number is significant enough such that joinder is impracticable, and numbers at least in the thousands. The disposition of the claims of these Class Members in a single action will provide substantial benefits to all parties and to the Court. The Class Members are readily identifiable from information and records in Defendant's possession, custody, or control, as well as from records kept by the Department of Motor Vehicles.

72.     <u>Typicality</u>:  Plaintiff's claims are typical of the claims of the Class in that Plaintiff, like all Class Members, purchased or leased a Class Vehicle designed, manufactured, and distributed by Defendant. The representative Plaintiff, like all Class Members, has been damaged by Defendant's misconduct in that he paid for the defective 360-Degree Camera and/or its components. Furthermore, the factual bases of Defendant's misconduct are common to all Class Members and represent a common thread resulting in injury to the Class.

73.     <u>Commonality</u>:  There is at least one question that is common to all proposed Class Members, the answer to which will advance resolution of this litigation. For example:

  (i)     Whether Class Vehicles suffer from a defective 360-Degree Camera;

  (j)     Whether the defect relating to the 360-Degree Camera constitutes an unreasonable safety risk;

  (k)     Whether Defendant knew or reasonably should have known of the defect pertaining to the 360-Degree Camera before it sold and leased Class Vehicles to Class Members;

19

(l)     Whether Defendant breached the implied warranty of merchantability by selling vehicles with the Defect; and

(m)     Whether Defendant breached its express by selling vehicles with the Defect.

74.     <u>Adequate Representation</u>:  Plaintiff will fairly and adequately protect the interests of the Class Members. Plaintiff has retained attorneys experienced in the prosecution of class actions, including consumer protection and product defect class actions, and those attorneys intend to vigorously prosecute this action.

75.     <u>Predominance</u>: As indicated above, there are numerous questions that will produce a uniform answer for all proposed Class Members. Such common answers are more important to the resolution of this litigation than the answer to any question that is individualized, and thus common questions predominate over any individualized inquiry.

76.     <u>Superiority</u>: A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Absent a class action, most Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy. Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that it will conserve the resources of the courts and the litigants and promote consistency and efficiency of adjudication.

## COUNT I
## Breach of Express Warranty
## Or. Rev. Stat.§ 72.8060

77.     Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 76, above, as if fully set forth herein.

78.     Plaintiff brings this count on behalf of himself and the Class against Defendant.

79.     Ford is and was at all relevant times a "manufacturer"" with respect to motor vehicles under Or. Rev. Stat. § 72.8060(1).

80.     The Class Vehicles are and were at all relevant times "consumer goods" within the meaning of Or. Rev. Stat. § 72.8060(1).

81.     The 360-Degree Camera assemblies were manufactured and/or installed in the Class Vehicles by Defendant and are covered by the express warranty.

82.     Defendant provided all purchasers and lessees of the Class Vehicles with an express warranty described herein, which became a material part of the bargain. Accordingly, Ford's express warranty is an express warranty under Oregon law.

83.     Ford's New Vehicle Limited Warranty expressly states that Ford will "without charge, repair, replace, or adjust all parts on your vehicle that malfunction or fail during normal use during the applicable coverage period due to a manufacturing defect in factory-supplied materials or factory workmanship" so long the Vehicle is properly operated and maintained and taken to a Ford dealership for repair within the warranty period.

84.     For certified pre-owned ("CPO") Vehicles, Ford offers an additional limited warranty covering CPO Vehicles for 12 months or 12,000 miles, whichever comes first.

85.     Defendant's NVLW and other warranties regarding the Class Vehicles formed a basis of the bargain that was reached when Plaintiff and Class Members purchased or leased the Class Vehicles with the defective 360-Degree Camera and/or related components.

86.     Plaintiff and Class Members experienced defects within the warranty period. Despite the existence of the NVLW, Defendant failed to inform Plaintiff and Class Members that the Class Vehicles were equipped with defective 360-Degree Cameras. Ford's repairs under the express warranty were ineffective, incomplete, and did not provide a permanent repair for the Defect.

87.    Ford's failures to repair the Defect in Class Vehicles breached the express warranty.

88.    Privity is not required here because Plaintiff and the other Class members of are intended third-party beneficiaries of contracts between Ford and its distributors and dealers, and specifically, of Ford's express warranties, including the NVLW, and any warranties provided with certified pre-owned CPO Vehicles. The dealers were not intended to be the ultimate consumers of the Class Vehicles and/or have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only. Strict privity is not required here because Defendant, as the manufacturer of the Class Vehicles, made express representations to Plaintiff and the Class regarding its warranties.

89.    Any attempt by Ford to disclaim or limit recovery to the terms of the express warranty is unconscionable and unenforceable here. Specifically, the warranty limitation is unenforceable because Ford knowingly sold or leased defective products without informing consumers about the Defect. The time limits are unconscionable and inadequate. And among other things, a gross disparity in bargaining power and knowledge of the extent, severity, and safety risk of the Defect existed between Ford and Class Members.

90.    Further, the limited warranty promising to repair and/or correct a manufacturing or workmanship defect fails of its essential purpose because the contractual remedy is insufficient to make Plaintiff and Class Members whole. Ford has failed and/or has refused to adequately provide the promised remedies, i.e., a permanent repair within a reasonable time.

91.    Plaintiff and Class Members provided notice to Ford of the breach of express warranties when they took their vehicles to Ford-authorized providers of warranty repairs. Plaintiff also provided written notice to Ford via letter dated September 18, 2023.

92.     As a result of Ford's breach of the applicable express warranties, owners and lessees of the Class Vehicles suffered, and continue to suffer, an ascertainable loss of money, property, and value of their Class Vehicles. Plaintiff and Class Members have accordingly been damaged in an amount to be determined at trial.

93.     As a result of Ford's breach of the express warranty, Plaintiff and the Class are entitled to legal and equitable relief against Ford, including actual damages, specific performance, attorney's fees, costs of suit, and other relief as appropriate.

<u>**COUNT II**</u>
**Breach of the Implied Warranty of Merchantability**
**Or. Rev. Stat. § 72.3140**

94.     Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 76, above, as if fully set forth herein.

95.     Plaintiff brings this count on behalf of himself and the Class against Defendant.

96.     Ford is and was at all relevant times a "merchant" with respect to motor vehicles and a "seller" of motor vehicles under Or. Rev. Stat. § 72.3140(1).

97.     The Class Vehicles are and were at all relevant times "goods" within the meaning of Or. Rev. Stat. § 72.3140(2)

98.     A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Or. Rev. Stat. § 72.3140. Ford knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. Ford directly sold and marketed Class Vehicles to customers through authorized dealers, like those from which Plaintiff and Class Members bought or leased their vehicles, for the intended purpose of consumers purchasing the Class Vehicles. Ford knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Plaintiff and Class Members, with no modification to the defective Class Vehicles.

99.     Ford provided Plaintiff and Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold. However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, inter alia, the Class Vehicles suffered from an inherent defect at the time of sale and thereafter, and they are not fit for their particular purpose of providing safe and reliable transportation.

100.     This implied warranty included, among other things: (i) a warranty that the Class Vehicles that Ford manufactured, supplied, distributed, and/or sold were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles would be fit for their intended use while the Class Vehicles were being operated.

101.     Contrary to the applicable implied warranties, the Class Vehicles, both at the time of sale and thereafter, were not fit for their ordinary and intended purpose of providing Plaintiff and the Class with reliable, durable, and safe transportation. Instead, the Class Vehicles were defective at the time of sale or lease and thereafter as more fully described above. Ford knew of this defect at the time these sale or lease transactions occurred.

102.     As a result of Ford's breach of the applicable implied warranties, Plaintiff and Class Members suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Defect, Plaintiff and the Class were harmed and suffered actual damages in that the Class Vehicles are substantially certain to fail before their expected useful life has run.

103.     Ford's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of the Oregon Uniform Commercial Code.

104.   Plaintiff and the Class have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Ford's conduct described herein.

105.   Privity is not required here because Plaintiff and the Class are intended third-party beneficiaries of contracts between Ford and its distributors and dealers. Ford knew who purchased the Class Vehicles, knew the purpose for which they were purchasing them, knew the Class's requirements for the Class Vehicles, delivered the Class Vehicles, and/or attempted repairs of the Class Vehicles.

106.   Plaintiff and Class Members were not required to notify Ford of the breach because affording Ford a reasonable opportunity to cure its breach of warranty would have been futile. Ford was also on notice of the Defect from the complaints and service requests it received from Plaintiff and the Members and through other internal sources.

107.   As a direct and proximate cause of Ford's breach, Plaintiff and Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Plaintiff and Class Members have incurred or will incur economic damages in the form of the cost of repair as well as additional losses.

108.   As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Plaintiff and Class Members have been damaged in an amount to be proven at trial.

### COUNT III
**Violations of the Washington Consumer Protection Act**
**Wash Rev. Code § 19.86.010, *et seq.***

109.   Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 76, above, as if fully set forth herein.

110.     Plaintiff brings this count on behalf of himself and the Class against Defendant.

111.     Plaintiff and members of the Class are "persons" within the meaning of Wash. Rev. Code § 19.86.010(2).

112.     The Washington Consumer Protection Act ("Washington CPA") broadly prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Wash. Rev. Code § 19.86.020. Ford engaged in unlawful trade practices and unfair or deceptive acts or practices that violated the Washington CPA.

113.     Ford engaged in unfair or deceptive trade practices that violated the Washington CPA. By failing to disclose the Defect, by concealing the Defect, by marketing the Class Vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance, and reliability, and that stood behind its vehicles after they were sold, Ford knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. Ford systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and the Defect in the course of its business.

114.     Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment in connection with the sale of the Class Vehicles.

115.     Ford's unfair and deceptive acts or practices occurred repeatedly in Ford's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

116.     Ford knew that the Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

26

117.    Ford knew or should have known that its conduct violated the Washington CPA.

118.    Defendant had a duty to Plaintiff and Class Members because:

(a)    Defendant was in a superior position to know the true state of facts about the safety defect contained in the Class Vehicles;

(b)    The omitted facts were material because they directly impact the safety of the Class Vehicles;

(c)    Defendant knew the omitted facts regarding the Defect were not known to or reasonably discoverable by Plaintiff and Class Members;

(d)    Defendant made partial disclosures about the quality of the Class Vehicles without revealing their true defective nature; and,

(e)    Defendant actively concealed the defective nature of the Class Vehicles from Plaintiff and Class Members.

119.    By failing to disclose the Defect, Defendant knowingly and intentionally concealed material facts and breached its duty not to do so.

120.    The facts Ford concealed or failed to disclose are material because a reasonable person would have considered them to be important in deciding whether to purchase or lease the Class Vehicles, or what to pay for them. Whether a vehicle's 360-Degree Camera is defective is a material safety concern. Had Plaintiff and Class Members known that the Class Vehicles suffered from the Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.

121.    Reasonable consumers do not expect that their vehicles will suffer from the Defect. That is the reasonable and objective consumer expectation for vehicles.

122.    As a result of Defendant's misconduct, Plaintiff and the Class Members have been harmed and have suffered actual damages in that the Class Vehicles are defective and require repairs or replacement.

123.    Ford's violations present a continuing risk to Plaintiff and the Class Members as well as to the general public. Ford's unlawful acts and practices complained of herein affect the public interest.

124.    Ford is liable to Plaintiff and the Class for damages in amounts to be proven at trial, including punitive damages, attorneys' fees, costs, and any other remedies the Court may deem appropriate under Wash. Rev. Code § 19.86.090. The Court should also exercise its discretion to increase the award of damages to each Class Member by three times their actual damages, not to exceed $25,000 per Class Member.

**COUNT IV**
**Breach of Express Warranty under the Magnuson-Moss Warranty Act,**
**15 U.S.C. § 2303 *et seq*.**

125.    Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 76, above, as if fully set forth herein.

126.    Plaintiff brings this cause of action on behalf of himself and on behalf of the Class against Defendant.

127.    Defendant provided all purchasers and lessees of the Class Vehicles with an express warranty described *infra*, which became a material part of the bargain.

128.    The 360-Degree Camera and its component parts were manufactured and/or installed in the Class Vehicles by Defendant and are covered by the express warranty.

129.    Ford's New Vehicle Limited Warranty ("NVLW") expressly states that Ford will "without charge, repair, replace, or adjust all parts on your vehicle that malfunction or fail during normal use during the applicable coverage period due to a manufacturing defect in factory-

supplied materials or factory workmanship" so long as the vehicle is properly operated and maintained and taken to a Ford dealership for repair within the warranty period.

130.    Defendant breached the express warranties by selling and leasing Class Vehicles with 360-Degree Cameras that were defective, requiring repair or replacement within the warranty period, and refusing to honor the express warranty by repairing or replacing, free of charge, the 360-Degree Camera and its component parts. Defendant has failed to "repair" the defects as alleged herein.

131.    Plaintiff was not required to notify Defendant of the breach because Defendant was on notice of the Defect from complaints and service requests it received from Class Members, from repairs and/or replacements of the 360-Degree Cameras, and from other internal sources.

132.    Plaintiff also provided notice to Defendant of their breach of warranty claims under the MMWA by letter dated September 18, 2023.

133.    As a direct and proximate cause of Defendant's breach, Plaintiff and the other Class Members have suffered, and continue to suffer, damages, including economic damages at the point of sale or lease. Additionally, Plaintiff and the other Class Members have incurred or will incur economic damages in the form of the cost of repair.

134.    Plaintiff and the other Class Members are entitled to legal and equitable relief against Defendant, including actual damages, consequential damages, specific performance, attorneys' fees, costs of suit, and other relief as appropriate.

### **COUNT V**
### **(Breach of Implied Warranty under the Magnuson-Moss Warranty Act, 15 U.S.C. § 2303 *et seq.*)**

135.    Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 76, above, as if fully set forth herein.

136.    Plaintiff brings this cause of action on behalf of himself and the Class against Defendant.

137.    The Class Vehicles are a "consumer product" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

138.    Plaintiff and Class Members are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

139.    Defendant is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)–(5).

140.    Defendant impliedly warranted that the Class Vehicles were of merchantable quality and fit for use. This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their 360-Degree Camera that Ford manufactured, supplied, distributed, and/or sold would provide safe and reliable transportation; and (ii) a warranty that the Class Vehicles and their 360-Degree Camera would be fit for their intended use while the Class Vehicles were being operated.

141.    Contrary to the applicable implied warranties, the Class Vehicles and their 360-Degree Camera at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiff and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including the defective design, manufacturing, and materials of their 360-Degree Cameras.

142.    Defendant's breach of implied warranties has deprived Plaintiff and Class Members of the benefit of their bargain.

143.    The amount in controversy of Plaintiff's individual claims meets or exceeds the sum or value of $25,000. In addition, the amount in controversy meets or exceeds the sum or

value of $50,000 (exclusive of interest and costs) computed on the basis of all claims to be determined in this suit.

144.    Defendant has been afforded a reasonable opportunity to cure its breach, including when Plaintiff and Class Members brought their vehicles in for diagnoses of their problems with the 360-Degree Camera.

145.    As a direct and proximate cause of Defendant's breach of implied warranties, Plaintiff and Class Members sustained and incurred damages and other losses in an amount to be determined at trial. Defendant's conduct damaged Plaintiff and Class Members, who are entitled to recover actual damages, consequential damages, specific performance, diminution in value, costs, attorneys' fees, and/or other relief as appropriate.

146.    As a result of Defendant's violations of the Magnuson-Moss Warranty Act as alleged herein, Plaintiff and Class Members have incurred damages.

147.    Plaintiff also provided notice to Defendant of its breach of warranty claims under the MMWA by letter dated September 18, 2023

### COUNT VI
### (For Fraud by Omission or Fraudulent Concealment)

148.    Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 76, above, as if fully set forth herein.

149.    Plaintiff brings this cause of action on behalf of himself and the Class.

150.    Defendant knew that the Class Vehicles suffered from an inherent Defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

151.    Defendant concealed from and failed to disclose to Plaintiff and Class Members the defective nature of the Class Vehicles.

152.    Defendant was under a duty to Plaintiff and Class Members to disclose the defective nature of the Class Vehicles because:

(a)    Defendant was in a superior position to know the true state of facts about the safety defect contained in the Class Vehicles;

(b)    The omitted facts were material because they directly impact the safety of the Class Vehicles;

(c)    Defendant knew the omitted facts regarding the Defect were not known to or reasonably discoverable by Plaintiff and Class Members;

(d)    Defendant made partial disclosures about the quality of the Class Vehicles without revealing their true defective nature; and

(e)    Defendant actively concealed the defective nature of the Class Vehicles from Plaintiff and Class Members.

153.    The facts concealed or not disclosed by Defendant to Plaintiff and the other Class Members are material in that a reasonable person would have considered them to be important in deciding whether to purchase or lease the Class Vehicles or pay less for them. Whether a vehicle's 360-Degree Camera is defective is a material safety concern. Had Plaintiff and Class Members known about the defective nature of the Class Vehicles, they would not have purchased or leased the Class Vehicles or would have paid less for them.

154.    Defendant concealed or failed to disclose the true nature of the design and/or manufacturing defects contained in the Class Vehicles to induce Plaintiff and Class Members to act thereon. Plaintiff and the other Class Members justifiably relied on Defendant's omissions to their detriment. This detriment is evident from Plaintiff's and Class Members' purchase or lease of Defendant's defective Class Vehicles.

155.    Defendant continued to conceal the defective nature of the Class Vehicles even after Class Members began to report the problems. Indeed, Defendant continues to cover up and conceal the true nature of the problem today.

156.    As a direct and proximate result of Defendant's misconduct, Plaintiff and Class Members have suffered and will continue to suffer actual damages. Plaintiff and the Class reserve their right to elect either to (a) rescind their purchase or lease of the Class Vehicles and obtain restitution or (b) affirm their purchase or lease of the Class Vehicles and recover damages.

157.    Defendant's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and Class Members' rights and well-being to enrich Defendant.

## COUNT VII
### (For Unjust Enrichment)

158.    Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 76 above as if fully set forth herein.

159.    Plaintiff brings this cause of action on behalf of himself and the Class in the alternative to his Breach of Express Warranty claim, Count I.

160.    Defendant has received and retained a benefit from Plaintiff and the Class Members, and inequity has resulted.

161.    As a direct and proximate result of Defendant's failure to disclose known defects, Defendant has profited through the sale and lease of the Class Vehicles, the value of which were artificially inflated by Defendant's concealment of and omissions regarding the Defect. Defendant charged higher prices for the Class Vehicles than the Class Vehicles' true value, and Plaintiff and Class Members thus overpaid for the Class Vehicles. Although these vehicles are

purchased through Defendant's authorized dealers and distributors, the money from the vehicle sales flows directly back to Defendant.

162.    Additionally, as a direct and proximate result of Defendant's failure to disclose known defects in the Class Vehicles, Plaintiff and Class Members have vehicles that require repeated, high-cost repairs that can and therefore have conferred an unjust substantial benefit upon Defendant.

163.    Defendant has been unjustly enriched due to the known defects in the Class Vehicles through the use of money paid that earned interest or otherwise added to Defendant's profits when said money should have remained with Plaintiff and Class Members.

164.    Plaintiff and Class Members were not aware of the true facts regarding the Defect in the Class Vehicles and did not benefit from Defendant's unjust conduct.

165.    As a result of the Defendant's unjust enrichment, Plaintiff and Class Members have suffered damages.

166.    Plaintiff does not seek restitution under his unjust enrichment claim. Rather, Plaintiff and Class Members seek non-restitutionary disgorgement of the financial profits that Defendant obtained as a result of its unjust conduct.

167.    Additionally, Plaintiff seeks injunctive relief to compel Defendant to offer, under warranty, remediation solutions that Defendant identifies. Plaintiff also seeks injunctive relief enjoining Defendant from further deceptive distribution, sales, and lease practices with respect to Class Vehicles; enjoining Defendant from selling the Class Vehicles with the misleading information; compelling Defendant to provide Class Members with replacement components that do not contain the defects alleged herein; and/or compelling Defendant to reform its warranties, in a manner deemed to be appropriate by the Court, to cover the injury alleged and to notify all

Class Members that such warranties have been reformed. Money damages are not an adequate remedy for the above requested non-monetary injunctive relief.

## PRAYER FOR RELIEF

Plaintiff, on behalf of himself and all others similarly situated, requests that the Court enter judgment against Defendant, as follows:

A.   An order certifying the proposed Class, designating Plaintiff as named representative of the Class, and designating the undersigned as Class Counsel;

B.   A declaration that Defendant is financially responsible for notifying all Class Members about the defective nature of the 360-Degree Cameras;

C.   An order enjoining Defendant from further deceptive distribution, sales, and lease practices with respect to Class Vehicles; compelling Defendant to issue a voluntary recall for the Class Vehicles pursuant to 49 U.S.C. § 30118(a); compelling Defendant to repair and eliminate the Defect from every Class Vehicle; enjoining Defendant from selling the Class Vehicles with the misleading information; and/or compelling Defendant to reform its warranty, in a manner deemed to be appropriate by the Court, to cover the injury alleged and to notify all Class Members that such warranty has been reformed;

D.   An award to Plaintiff and the Class for compensatory, exemplary, and statutory damages, including interest, in an amount to be proven at trial;

E.   Any and all remedies provided pursuant to the Magnuson-Moss Warranty Act;

F.   Any and all remedies provided pursuant to the causes of action and statutes alleged herein;

G.   A declaration that Defendant must disgorge, for the benefit of the Class, all or part of the ill-gotten profits it received from the sale or lease of the Class Vehicles or make

full restitution to Plaintiff and Class Members;

H.  An award of attorneys' fees and costs, as allowed by law;

I.  An award of pre-judgment and post-judgment interest, as provided by law;

J.  Leave to amend the Complaint to conform to the evidence produced at trial; and

K.  Such other relief as may be appropriate under the circumstances.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury of all issues in this action so triable.

Dated: September 22, 2023

*/s/ Adam J. Levitt*
Adam J. Levitt
John E. Tangren
Daniel R. Ferri
**DiCELLO LEVITT LLP**
Ten North Dearborn Street, Sixth Floor
Chicago, Illinois  60602
Telephone:  312-214-7900
alevitt@dicellolevitt.com
jtangren@dicellolevitt.com
dferri@dicellolevitt.com

Jason T. Dennett*
Kaleigh N. Boyd*
**TOUSLEY BRAIN STEPHENS PLLC**
1200 Fifth Avenue, Suite 1700
Seattle, Washington  98101
Telephone:  206-682-5600
jdennett@tousley.com
kboyd@tousley.com

Jason L. Lichtman*
Andrew Kaufman*
Muriel Kenfield-Kelleher*
**LIEFF CABRASER**
**HEIMANN & BERNSTEIN**
250 Hudson Street, 8th Floor
New York, New York  10013
Telephone:  212-355-9500
jlichtman@lchb.com
akaufman@lchb.com
mkenfieldkelleher@lchb.com

*Counsel for Plaintiff and the Proposed Class*

*\*Motions for admission pro hac vice*
  *to be filed*

## CERTIFICATE OF SERVICE

I hereby certify that on September 22, 2023 a copy of the foregoing document was filed electronically using the CM/ECF System.  Notice of this filing will be sent by operation of the Court's electronic filing system to all Parties indicated on the electronic filing receipt. Parties may access this filing through the Court's electronic filing system.

By: */s/ Adam J. Levitt*